UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

BOYD MARTIN DOWELL )
)
V. ) NO. 2:12-CV-359
)
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security )

## REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. The plaintiff has filed a Motion for Judgment on the Pleadings [Doc. 12], and the defendant Commissioner has filed a Motion for Summary Judgment [Doc. 16].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988).

Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

On September 21, 2001, an Administrative Law Judge ["ALJ"], the Honorable Gerald I. Krafsur, rendered a hearing decision which held that the plaintiff was entitled to benefits, commencing August 1, 2000. The first ALJ noted that the plaintiff was 29 years old when his disability commenced in August of 2000. He had a "marginal education." He found that the plaintiff had severe impairments of "cerebral palsy, right hip degeneration, degenerative disc disease, a Grade II spondylolisthesis at L5-S1, and muscle spasm. (Tr. 78). The key findings in the hearing decision were that the plaintiff was credible; that his impairments prevented him from performing even a significant range of sedentary work (plaintiff's residual functional capacity or "RFC"); that he could not perform his past relevant work; that he had a marginal education; and that he did not have transferrable skills to perform other work within his physical and mental residual functional capacity. (Tr. 79-80).

On August 22, 2008, following a routine review of continuing eligibility for benefits, the Commissioner advised plaintiff that "we've decided that your health has improved since we last reviewed your case...," that he was "now able to work...," and that his benefits would cease to be paid. (Tr. 84). The letter advised him of his right to appeal, and the time for doing so. It also stated "you may want help from a friend, lawyer, or someone else. There are groups that can find you a lawyer. Some can give you a free lawyer. We can give you the names of these groups." (Tr. 85). Plaintiff elected to appeal, which led an administrative

2

hearing before a different ALJ on November 16, 2010. The subsequent hearing decision by that ALJ finding the plaintiff capable of substantial gainful activity is the subject of this judicial review.

The plaintiff's medical history is summarized in the Commissioner's brief as follows:

> Plaintiff was diagnosed with cerebral palsy as a child, and had numerous surgeries on his legs and feet (Tr. 43, 47-48). He testified he was not currently under the care of a doctor (Tr. 36). He testified the only pain medication he took was aspirin (Tr. 38).
>
> Karl W. Konrad, Ph.D., M.D., a family practitioner, examined Plaintiff in February 2001 and diagnosed him with muscle wasting and weakness of both calves and deformities of both femoral heads, limited range of motion of the right hip, ankle contractures and abnormal gait (Tr. 211-14). Dr. Konrad reviewed x-rays that revealed marked deformity of both femoral heads, worse on the right (Tr. 213). Plaintiff walked with a prominent limp of the right leg because of right leg length discrepancy, flattening of the arches, and limited range of motion of the right ankle (Tr. 212). Dr. Konrad opined Plaintiff could lift and/or carry a maximum of 20 pounds for up to 1/3 of an 8-hour workday, frequently lift and/or carry a maximum of 10 pounds from 1/3 to 2/3 of an 8-hour workday, could stand and/or walk with frequent breaks for a total of 4 hours in an 8-hour workday and sit, with normal breaks, for a total of 6 hours in an 8-hour workday (Tr. 213).
>
> Plaintiff was examined by Krish Purswani, M.D., a family practitioner, in December 2008 (Tr. 236-39). Dr. Purswani assessed him, in pertinent part, with chronic low back pain, bilateral knee, hip and foot pain (Tr. 239). He reviewed no prior medical records (Tr. 236). Dr. Purswani observed Plaintiff had an antalgic gain (indicative of pain) (Tr. 237). He observed Plaintiff's hips had normal range of motion for adduction, extension and external and internal rotation (Tr. 238). His hip flexion was 80 degrees on the right, and 90 degrees on the left (Tr. 238). Plaintiff's knees were largely normal, and his ankles were stable and nontender, with limited flexion (Tr. 238). His right leg was about an inch shorter than the left, treated with a higher heeled shoe (Tr. 238). Plaintiff's back was non-tender, he had a normal range of motion, but he had a positive straight leg raise test both sitting and standing (Tr. 238). Dr. Purswani noted Plaintiff had normal strength in his arms and legs and normal reflexes (Tr. 238). He opined Plaintiff could frequently lift 40 pounds for 4 hours, could stand and walk with breaks for a total of 6 hours in an 8-hour day, and sit for a total of 8 hours in an 8-hour day (Tr. 239).
>
> Plaintiff's only other treatment was for a July 2008 visit to an orthopedist for a displaced collar bone (clavicle), injured when he fell off a horse (Tr. 219-20).
>
> Plaintiff was evaluated in February 2001 by licensed psychologist Robert S. Spangler, Ed.D. and Kathy Jo Miller, Me.D. (Tr. 206-09). They diagnosed Plaintiff with average intellectual functioning, a full scale IQ of 91, marginal educational

3

level and limited math and reading, based on psychological testing and their evaluation (Tr. 209). Plaintiff read on a 7th grade level and his arithmetic achievement was at the 6th grade level (Tr. 209-10). Plaintiff told them he left school because he got fed up and was often in trouble for smoking (Tr. 207). They assessed him with no mental impairment except poor academic skills (Tr. 209).

In January 2009, non-examining state agency psychiatrist Aileen H. McAlister, M.D., opined Plaintiff had no severe mental impairment (Tr. 221-34).

[Doc. 17, pgs. 3-5].

Plaintiff's hearing before the second ALJ was held on November 16, 2010. At the commencement of the hearing, after recounting the procedural history of plaintiff's case and how the hearing came to be, the ALJ advised Mr. Dowell at the outset "[y]ou have the right to have an attorney or non-attorney to represent you in these proceedings. Is it your choice today to proceed without a formal representative?" (Tr. 27). Plaintiff answered "[y]es, but would it be advisable for me to have an attorney?" The ALJ responded as follows:

> Well when people ask me that, I -- what I tell them is this. Most of the time -- and when you were awarded benefits, you had an attorney representing you. Most of the people come in here -- I would say 80 to 90 percent have an attorney representing them. And what the attorneys and representatives do to assist the claimants is they get medical records, prepare the case for hearing, make sure they go over everything with you and help present your testimony. So in that respect, an attorney is helpful to you. You don't have to have an attorney with you if you do not and you wish to proceed today, I will ask questions of you and attempt to gather the necessary information from your testimony and that from the other witnesses. But you have the right to have an attorney to represent you, and I would never advise you not to get an attorney, that's your choice. What would you like to do?

Plaintiff replied "I guess I'd like to go ahead and proceed with this." (Tr. 28).

The ALJ then explained that he was going to "cover the necessary information." He explained to plaintiff that plaintiff would be given the opportunity to tell him "what you want me to know about your case, then I'll issue a new decision." (Tr. 28).

He then described the exhibits to the file which would be used at the hearing and

4

asked plaintiff if he had any objections to the exhibits, and plaintiff responded that he did not. (Tr. 29). The ALJ then described the issue at the hearing of whether the plaintiff's benefits would "cease or end." He described the test of whether there had been medical improvement and plaintiff responded that he understood the issue. The ALJ then described how he would proceed, which was for him to ask plaintiff questions first, then plaintiff's mother, and then if necessary, question Cathy Sanders, the vocational expert ["VE"]. (Tr. 30).

The ALJ then proceeded to examine the plaintiff in great detail about his educational background, subjects and skills he had trouble with, the physical requirements of his jobs, his social and legal history, his medical treatment and medications, his pain and activities.[1] (Tr. 5-20). The ALJ then examined the plaintiff's mother regarding his medical and work history, and his actvities. (Tr. 20-23).

The ALJ then questioned the VE. He asked Ms. Sanders the following hypothetical question:

> If you would, assume that I find the claimant to be a 39 year old individual, who has completed 10 years of formal education, he's described some of that as being in special education. If you'll assume the claimant has the work history which you have described. First of all, I'll ask you to assume the claimant is restricted to the demands of light work, which is work that requires lifting of 20 pounds occasionally and 10 pounds frequently. I'll ask you to assume further the claimant would need a job that would allow him to sit or stand at his option. Now with these restrictions, first of all, would there be jobs that the claimant could perform that exist in the regional and national economy?

(Tr. 23-24).

Ms. Sanders identified various jogs. First, she identified entry-level office assistants,

---

[1]Plaintiff's only medical treatment since the award of benefits was some treatment for a displaced left clavicle fracture sustained when he fell while horseback riding. (Tr. 219-20). His only medication is aspirin. (Tr. 12).

5

with 3,200 locally and 432,000 nationally.  She also identified telephone answering clerk jobs, with 1,100 in the region and 97,000 in the United States.  She identified jobs as food cashiers, with 3, 000 in the local economy and 1.2 million in the nation.  Finally, she identified ticket clerks, with 900 in the local region and 84,000 in the nation.  (Tr. 24).

She was then asked regarding sedentary jobs for "an individual with the same age, education and prior work" as plaintiff, again with the sit/stand option.  She identified 3,950 jobs in the local economy and 161,000 jobs in the national economy at that level of restriction.  He then asked her "if the claimant's pain frequently interfered with his ability to concentrate and persist at work tasks, could he do the jobs that you've enumerated or any others?"  She replied that there would be no jobs with that further restriction.   Finally, he asked her if her testimony was consistent with the Dictionary of Occupation Titles ["DOT"].  She replied that it was.    (Tr. 25-26).  The ALJ then asked the plaintiff if he had any questions for the VE, and he did not.  He asked the plaintiff if there was anything else he wanted to tell the ALJ, and he replied there was not.  (Tr. 26).

In his hearing decision, the ALJ found that the plaintiff's "comparison point decision" or CPD, was the date of the first ALJ's decision.  He found that the plaintiff had the severe impairments as of his CPD, and presently, which were enumerated by the first ALJ.  He found that medical improvement occurred as of October 31, 2008, and that plaintiff did not develop any additional impairments between the CPD and October 31, 2008.  He stated that "since October 31, 2018, the claimant did not have an impairment or combination of impairments..." which met or equaled any of the "Listings" of impairments in the regulations.  (Tr. 15-16).

The ALJ then recounted in great detail the examinations of Dr. Konrad in 2001 and Dr. Purswani in 2008, as well as the contact with orthopedic physicians for his displaced clavicle fracture in July of 2008, noting that he missed his last appointment with them and had not sought or required any treatment since. The ALJ noted that the plaintiff had not alleged, or ever been found to have, a severe mental impairment, noting Dr. Spangler's examination and findings of IQ scores in the low 90's. (Tr. 17-18).

The ALJ then recounted the previous ALJ's finding that the plaintiff "could perform no significant lifting and no prolonged standing, walking, or sitting, and, as a result of his credible complaints of pain...the claimant would be unable to maintaining adequate work attention and concentration, adequate work production standards, adequate social interaction with co-workers and supervisors, and adequate work attendance." The ALJ then stated "[h]owever, the evidence of record subsequent to his comparison point date shows that the claimant had improvement in his strength of the bilateral lower extremities and in tandem walking." The ALJ noted the total lack of any treatment of any kind, except for the lone incident regarding the horse riding accident. He noted that the plaintiff only takes aspirin for pain as pain medication. He noted that plaintiff drove a car until he lost his licence due to a DUI conviction. He recounted the plaintiffs daily activities. He then found that the plaintiff had "had improvement" to his condition since the comparison point date. He then found that plaintiff, as of October 31, 2008, had the RFC to perform light work which allows a sit/stand option. (Tr. 18).

The ALJ explained his basis for finding improvement in the plaintiff's condition. He stated that he gave great weight to the opinion of Dr. Konrad and the State Agency

7

physicians. He gave "some weight" to the opinion of Dr. Purswani, but disagreed with Dr. Purswani's opinion regarding the amount of standing and walking that the plaintiff could do in an 8-hour workday, instead finding that plaintiff was limited in that he needed a sit/stand option. He noted that plaintiff had not alleged, nor was there evidence of, any severe mental impairment. He did not find the plaintiff's complaints of disabling pain credible, again citing the total lack of medical treatment for pain or anything else, save the horseback accident, during the relevant time period, and the use of only aspirin as a pain reliever. He then concluded that the plaintiff's medical improvement is related to his ability to work because it resulted in an increase in his RFC. (Tr. 19).

The ALJ then described the plaintiff's vocational characteristics and concluded, based upon plaintiff's RFC and the jobs identified by the VE, that "as of October 31, 2008, the plaintiff could perform a significant number of jobs. Accordingly, he was no longer disabled. (Tr. 20-21).

As stated by plaintiff, the standard to be observed in a cessation of benefits case is that substantial evidence must show that a plaintiff has experienced medical improvement related to his ability to work, and if the plaintiff is currently able to perform substantial gainful activity, although there is no presumption of continuing disability. *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284 (6th Cir., 1994). This Court interprets this to mean that a different ALJ cannot merely look at the same *exact* evidence relied upon by the original ALJ and find improvement based upon his or her own perceptions of that evidence. There must be something more from the time after benefits were originally awarded to show the required improvement. By the same token, the Court can see no logical reason why

8

evidence before the first ALJ cannot still support a contrary finding by the second ALJ if the new evidence shows improvement. In other words, Dr. Konrad's evaluation, although not found sufficient by the first ALJ to support a finding that the plaintiff could engage in substantial gainful activity, could still be given great weight by the present ALJ when coupled with other evidence showing an improvement in plaintiff's pain. The plaintiff's pain appears to have been ALJ Krafsur's deciding factor in finding him disabled.

The plaintiff first asserts that the decision finding the necessary improvement is not supported by substantial evidence. Second, he states that "plaintiff did not make a knowing and intelligent waiver of his right to counsel, and he was prejudiced by his lack of counsel at his hearing.

Taking on the second issue first, plaintiff relies heavily on *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048 (6th Cir. 1983). The Court has carefully read *Lashley*, and it did indeed severely criticize the ALJ in that case and found he denied that claimant a fair hearing. The Court has also read the many cases from the Sixth Circuit decided since *Lashley*, including *Duncan v. Sec'y of Health and Human Serv.*, 801 F2d 847 (6th Cir. 1986). These cases make clear that whether a claimant knowingly and intelligently waived his right to hire an attorney is a basically to be decided on a case-by-case basis. The Court finds that the plaintiff here is far different from the plaintiff in *Lashley*, and is much more akin to the plaintiff in *Duncan*. Plaintiff here is of at least average intelligence, as evidenced by his testimony and particularly by his discussion with the ALJ as to whether he needed an attorney. That colloquy, reproduced verbatim earlier in this report and recommendation, shows that plaintiff understood what his rights were, and accepted the risk

9

of representing himself. Moreover, the ALJ did nothing to pressure him to proceed without counsel.

Another aspect of *Lashley*, *supra*, was its finding that the ALJ did not fulfill his duty to fully develop the record for the unrepresented claimant. The present ALJ went to great lengths to fairly develop the record at the hearing, as again described above. He went into every aspect of the plaintiff's case fairly and thoroughly, and in a professional, non-confrontational manner. In several instances he asked the precise questions that attorneys ask in these hearings when representing their clients.

This plaintiff has received excellent representation in appealing the ALJ's ruling and in pursuing this judicial appeal. However, he simply was not prejudiced at his hearing by a lack of counsel. The ALJ covered aspects of the case in as great a detail, if not more so, than counsel usually do in such hearings. While there may have been some topics which counsel could have pursued had he been there, plaintiff's choice to "go it alone" was not forced upon him. The hearing was fair.

Plaintiff also substantively points out that the law requires that the ALJ must find that the plaintiff was not only capable of substantial gainful activity through the date the Commissioner initially found that he was no longer disabled, October 31, 2008, but through the date of his hearing decision, December 14, 2010. Since there was no medical treatment of any kind provided between those two dates, and no allegation of any different condition during that period of time, the ALJ's failure to affirmatively state that plaintiff was not disabled through the date of the hearing decision was, at most, a harmless error.

With regard to the purported lack of substantial evidence, plaintiff argues that "there

10

is no significant difference between the findings of Dr. Karl Konrad (Tr. 210-214) and those of Dr. Krish Purswani (TR 235-239)." That is of course true, except that Dr. Konrad found the plaintiff more restricted than Dr. Purswani in his ability to stand and walk. But Dr. Konrad's assessment, absent the finding by the first ALJ that "his credible complaints of pain" prevented the plaintiff from sustaining concentration, interacting with co-workers, and attending work adequately to perform substantial gainful activity. Dr. Konrad's assessment was not the reason the first ALJ found that the plaintiff could not perform a significant range of sedentary work. The ALJ found that "as a result of his combined physical impairments, the claimant can perform no significant lifting and no prolonged standing, walking or sitting." (Tr. 78). Dr. Konrad opined that the plaintiff could perform the lifting requirements of light work, but could only stand or walk for four hours in an 8 hour workday.

But as previously stated, something new must be inserted into the mix to find the required "improvement." To this end, the ALJ mentioned "improvement in his strength of the bilateral lower extremities and in tandem walking." This is evident in the observations noted by Dr. Purswani in his physical examination of the plaintiff. The ALJ also mentioned the lack of any treatment for his severe impairments during the entire period between the onset of the previously found disability and the present. Regarding the alleged totally debilitating pain, the ALJ pointed out the lack of any medication save aspirin, the plaintiff's daily activities, and his ability to drive a car if were to regain his lost licence. In the opinion of the Court, these are material evidence of an improvement in the plaintiff's condition.

Finally, plaintiff asserts that the hypothetical question asked of the VE, and thus her response, cannot constitute substantial evidence because it did not accurately describe the

11

plaintiff's RFC and impairments. Particularly, he states that it did not adequately describe plaintiff's marginal education. In fact, the question directly took into account the precise level and nature of plaintiff's education. It did not mention difficulties in English because those described by the plaintiff in his testimony did not differ from large numbers of people in the workforce with average intellectual functioning and a marginal education.

Also with respect to the VE's testimony, the plaintiff asserts that the ALJ erred in accepting testimony from the VE that did not properly jive with the Dictionary of Occupational Titles. The ALJ is required to ask the VE if the testimony is consistent with the DOT, which he did. Whether the VE's assertion of her testimony's consistency with the DOT was a "fact" or not, Social Security Ruling 00-4p states that "evidence from VE's can include information not listed in the DOT." 2000 WL 1898704, at *2. A VE's "uncontradicted, credible testimony...remains a 'source of occupational evidence.'" *Lindsley v. Commissioner of Social Security*, 560 F.3d, 601, 606 (6th Cir. 2009).

The termination of disability benefits is not a matter to be taken lightly. The ALJ in the present case did not take it lightly. The plaintiff made a voluntary, informed decision not to have a lawyer, and the ALJ went to appropriately fair lengths to compensate for the lack of counsel in developing the testimony at the hearing. There was substantial evidence to show medical improvement related to plaintiff's ability to perform work. It is therefore respectfully recommended that the plaintiff's Motion for Judgment on the Pleadings [Doc. 12] be DENIED, and the defendant Commissioner's Motion for Summary Judgment [Doc.

16] be GRANTED.[2]

                              Respectfully submitted,

                                                  s/ Dennis H. Inman
                                                  United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).

13